# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## CIVIL CASE NO. 1:23-cv-00129-MR

| | |
|---|---|
| ACCORDIUS HEALTH AT ASHEVILLE, LLC, )<br><br>Plaintiff, )<br><br>vs. )<br><br>UNITED STATES SMALL BUSINESS ADMINISTRATION, KELLY LOEFFLER, in her official capacity as Administrator of the Small Business Administration; SCOTT BESSENT, in his official capacity as United States Secretary of the Treasury; and UNITED STATES, )<br><br>Defendants. ) | <u>**MEMORANDUM OF DECISION AND ORDER**</u> |

**THIS MATTER** is before the Court on the Plaintiffs' Motion for Summary Judgment in All Consolidated Cases [Doc. 32] and the Defendants' Motion for Summary Judgment [Doc. 34].

## I.    PROCEDURAL BACKGROUND

The Plaintiff Accordius Health at Asheville, LLC ("Accordius) filed this action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500, et seq., seeking judicial review of the denial by the U.S. Small Business

Administration ("SBA") of the Plaintiff's application for forgiveness of a Paycheck Protection Program ("PPP") loan issued pursuant to the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), 15 U.S.C. §§ 9001, et seq. [Doc. 1].[1]

On December 1, 2023, the parties filed a joint motion to consolidate this case with 47 other cases filed by limited liability companies in five other states on the grounds that these cases involve overlapping parties, a common set of operative facts, and common questions of law. [Doc. 27]. On December 20, 2023, the Court granted the parties' motion. [Doc. 29].

Thereafter, the parties filed cross-motions for summary judgment, which were fully briefed. [Docs. 32, 33, 34, 35, 36, 38]. While these motions were pending, on June 28, 2024, the Supreme Court issued its decision in Loper Bright Enterprises v. Raimondo, an administrative law case overturning the longstanding principle of Chevron[2] deference. 603 U.S. 369 (2024). In response to this change in law relevant to this case, the Court ordered supplemental briefing from both parties on July 1, 2024. [Text-Only Order entered July 1, 2024]. The Plaintiffs filed a supplemental

---

[1] The Plaintiff named as Defendants the U.S. Small Business Administration, the SBA Administrator, the Secretary of the United States Treasury, and the United States of America.

[2] Chevron, U.S.A., Inc. v. Nat. Resources Def. Council, 467 U.S. 837 (1984).

memorandum on July 12, 2024, and the Defendants filed the same on July 18, 2024. [Docs. 46, 47].

Having been fully briefed, these motions are ripe for review.

## II. STANDARD OF REVIEW

The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Pursuant to the APA, the Court may set aside the agency's action if such action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law…." 5 U.S.C. § 706(2)(A), (C), and (D); N.C. Wildlife Fed'n v. N.C. Dep't of Transp., 677 F.3d 596, 601 (4th Cir. 2012).

"Because this case involves the review of agency action pursuant to the APA, the Court's review is confined to the administrative record on which the agency's decision was based." S. Four Wheel Drive Ass'n v. U.S. Forest Serv., No. 2:10-cv-15, 2012 WL 4106427, at *2 (W.D.N.C. Sept. 19, 2012) (Reidinger, J.) (citations omitted). "Under APA section 706(2) review, the court does not employ the usual summary judgment standard." Id. (quoting Ctr. for Sierra Nevada Conservation v. U.S. Forest Serv., 832 F.Supp.2d

1138, 1148 (E.D. Cal. 2011)) (other citations omitted).  Rather, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  Chan v. U.S. Citizenship and Immigration Servs., 141 F.Supp.3d 461, 464 (W.D.N.C. 2015).

As the Supreme Court recently reiterated in Loper Bright, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires."  603 U.S. at 412.  "[C]ourts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous."  Id. at 413. However, "when the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits."  Id. at 371. "The court fulfills that role by recognizing constitutional delegations, fixing the boundaries of the delegated authority, and ensuring the agency has engaged in reasoned decisionmaking within those boundaries."  Id. (citation and internal quotation marks omitted).

4

## III. FACTUAL BACKGROUND

### A. SBA's § 7(a) Loan Program

Section 7(a) of the Small Business Act ("the Act") "empower[s]" SBA to guarantee general-purpose loans to small businesses. 15 U.S.C. § 636(a). The Act also empowers SBA, "[i]n the performance of . . . [its] functions, powers, and duties vested" under § 7(a) to "take any and all actions" the agency "determines . . . are necessary or desirable in making, servicing, compromising, modifying, liquidating, or otherwise dealing with or realizing on loans[.]" Id. § 634(b)(7).

Ordinarily, to qualify for a § 7(a) loan an applicant must, *inter alia*, meet size standards for a "small" business set forth in the Act and SBA rules, usually stated in terms of the aggregate number of employees, or annual receipts, of the borrower and its affiliates. 15 U.S.C. § 632(a)(1), (2); 13 C.F.R. §§ 120.100(d), 121.201. The statute does not prescribe a formula for the exact amount of a § 7(a) loan, but states that § 7(a) loans shall be no greater than $5,000,000, and the amount guaranteed by SBA no greater than $3,750,000. 15 U.S.C. § 636(a)(3)(A). Typically, SBA guarantees loans by private lenders rather than disburse funds directly. See In re Gateway Radiology Consultants, P.A., 983 F.3d 1239, 1248 (11th Cir. 2020).

## B. The CARES Act and the PPP

Congress enacted the CARES Act in March 2020 in response to the onset of the COVID-19 pandemic. See 15 U.S.C. §§ 9001, et seq. The CARES Act included the implementation of the PPP, CARES Act § 1102, which was enacted to extend relief to small businesses experiencing economic hardship due to the pandemic. See 85 Fed. Reg. 20,811, 20,811-12 (Apr. 15, 2020).

Section 1102(a)(2) of the CARES Act temporarily expanded SBA's business-loan authority by adding a new paragraph (36) to § 7(a), 15 U.S.C. § 636(a)(36). See Gateway Radiology, 983 F.3d at 1249 ("the PPP was not created as a standalone program; instead, it was added into § 7(a)"). Subparagraph 636(a)(36)(B) stated that "[e]xcept as otherwise provided in this paragraph, the [SBA] *may* guarantee [PPP] loans," issued by private lenders, "under the same terms, conditions, and processes as [other] loan[s] made under" § 7(a). 15 U.S.C. § 636(a)(36)(B) (emphasis added); see id. § 636(a)(36)(F)(ii). The statute then detailed the ways in which PPP loans were to differ from other § 7(a) loans. Id. § 636(a)(36)(D)-(W).

Among these differences, the CARES Act relaxed size limitations to allow businesses with as many as 500 employees (or more, in certain industries) to receive assistance. Id. § 636(a)(36)(D)(i)(I), (II). The CARES

6

Act also enlarged the $5,000,000 cap applicable to other § 7(a) loans, providing that the "maximum amount" of a PPP loan was to be (1) the borrower's average monthly payroll costs for the preceding year, multiplied by 2.5, plus the balance of the borrower's eligible SBA disaster loans (hereinafter, the "payroll-based formula," or "amount") or (2) $10,000,000, whichever is less. Id. § 636(a)(36)(E).

Congress initially authorized SBA to guarantee up to $349 billion in PPP loans by June 30, 2020. CARES Act § 1102(b)(1); 15 U.S.C. § 636(a)(36)(A)(ii)-(iii), (B). Congress instructed SBA to issue rules implementing the PPP "[n]ot later than 15 days after" the CARES Act's enactment on March 27, 2020. 15 U.S.C. § 9012. Congress also instructed SBA to issue these rules without regard to APA notice-and-comment procedures. 15 U.S.C. § 9012 (citing 5 U.S.C. § 553(b)). Exercising this emergency authority, SBA issued a number of rules between April 15 and October 19, 2020. [See Doc. 35-1].

Congress authorized another $310 billion in PPP loans on April 24, 2020. Pub. L. No. 116-139, 134 Stat. 620, § 101(a)(1). Ultimately Congress authorized SBA to guarantee more than $813 billion in PPP loans. Pub. L. No. 117-2, 135 Stat. 4, § 5001(d)(1).

7

## C.     Forgiveness of PPP Loans

Section 1106 of the CARES Act provides for the forgiveness of PPP loans, stating that "[a]n eligible recipient" of a PPP loan "shall be eligible for forgiveness . . . in an amount equal to" the sum of its covered payroll costs and other allowable expenses, 15 U.S.C. § 636m(b), but not to exceed the principal amount of the loan, id. § 636m(d)(1). To obtain forgiveness, an eligible borrower must submit an application and supporting documentation to its lender, which then determines if the borrower is entitled to forgiveness under the Act; if the lender so determines, it then submits a request for payment to SBA. 15 U.S.C. § 636m(g); see 85 Fed. Reg. 38,304, 38,306 (June 26, 2020).  SBA then remits the appropriate amount to the lender— subject, however, to any SBA review of the loan.[3]  15 U.S.C. § 636m(c)(3); 85 Fed. Reg. at 38,306.  If SBA agency determines during a review that "an action by the borrower has resulted in its receipt of a PPP loan that did not meet program requirements," it denies forgiveness of the loan.[4]  85 Fed. Reg. 33,010, 33,012-13 (June 1, 2020).

---

[3] As such, the loan is not actually forgiven, as the lender is paid in full.  The SBA simply pays the loan on the borrower's behalf.

[4] SBA established a streamlined PPP loan-origination process based on borrower self-certifications of eligibility.  See 85 Fed. Reg. at 20,812, 20,814-16.  Because borrowers' applications and supporting documentation were maintained by lenders, not sent to SBA, see 85 Fed. Reg. at 20,814, SBA did not (and as a practical matter could not) make independent PPP borrower-eligibility determinations at the loan-origination stage.

### D. Interim Final Rule No. 7

Among the rules SBA issued under its CARES Act authority, on May 4,

2020, was Interim Final Rule No. 7 ("IFR No. 7") that stated as follows:

> To preserve the limited resources available to the PPP program, and in light of the previous lapse of PPP appropriations and the high demand for PPP loans, **businesses that are part of a single corporate group shall in no event receive more than $20,000,000 of PPP loans in the aggregate. For purposes of this limit, businesses are part of a single corporate group if they are majority owned, directly or indirectly, by a common parent**. This limitation shall be immediately effective with respect to any loan that has not yet been fully disbursed as of April 30, 2020.

> It is the responsibility of an applicant for a PPP loan to notify the lender if the applicant has applied for or received PPP loans in excess of the amount permitted by this interim final rule and withdraw or request cancellation of any pending PPP loan application or approved PPP loan not in compliance with the limitation set forth in this rule. Failure by the applicant to do so will be regarded as a use of PPP funds for unauthorized purposes, and the loan will not be eligible for forgiveness. A lender may rely on an applicant's representation concerning the applicant's compliance with this limitation.

> The Administrator, in consultation with the Secretary, determined that limiting the amount of PPP loans that a single corporate group may receive will promote the availability of PPP loans to the largest possible number of borrowers, consistent with the CARES Act. The Administrator has concluded that a limitation of $20,000,000 strikes an appropriate balance

> between broad availability of PPP loans and program resource constraints.

85 Fed. Reg. 26,324, 26,325 (May 4, 2020) (footnote omitted and emphasis added). SBA concluded that it had authority to issue an "aggregate limitation" on the amount of PPP loans issued to a single corporate group, because the terms of the CARES Act "specify a 'maximum'—but not a minimum—loan amount" for each borrower that SBA "may" guarantee. Id. at n.1 (citing 15 U.S.C. § 636(a)(36)(B), (E)).

### E. The Economic Aid Act

The PPP expired on August 8, 2020, see Pub. L. No. 116-147, 134 Stat. 660, but the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (the "Economic Aid Act," or "EAA")[5] reauthorized and extended the program to March 31, 2021, and added another $147.5 billion in loan authority. EAA § 323(a)(1). In pertinent part, the EAA authorized SBA to guarantee so-called "second-draw" PPP loans to certain businesses that obtained "first-draw" PPP loans under the CARES Act, EAA § 311(a) (adding 15 U.S.C. § 636(a)(37)), under the same terms and conditions as first-draw loans, except as the EAA otherwise provided. 15 U.S.C. § 636(a)(37)(B).

---

[5] The EAA is part of the Consolidated Appropriations Act, 2021, Div. N, Title III, Pub. L. No. 116-260, 134 Stat. 1182 (Dec. 27, 2020).

The EAA established a "maximum loan amount" for second-draw PPP loans based on the CARES Act's payroll-based formula for first-draw loans, but with a smaller cap of $2,000,000. Id. § 636(a)(37)(C).

The EAA also conferred "emergency rulemaking authority" on SBA, directing it to issue regulations implementing the EAA's amendments "[n]ot later than 10 days after" the EAA's enactment, without regard to the notice-and-comment requirements of § 553(b). EAA § 303. Between January 14 and September 16, 2021, SBA issued an additional set of PPP rules under this authority. [See Doc. 35-1].

## F.   The Plaintiffs

The Plaintiffs in these cases are 48 limited liability companies ("LLCs") operating in five states as skilled nursing facilities. Each is owned in equal measure (50 percent each) by two individuals: Simcha Hyman and Naftali Zanziper. [Administrative Record ("A.R.")[6] at 672-75]. The Plaintiffs are part of a larger group of 343 LLCs jointly owned by Hyman and Zanziper. [A.R. at 680, 695-705]. Hyman and Zanziper also own and operate an investment firm, the Portopiccolo Group. [A.R. at 1116]. Hyman is the CEO of the Portopiccolo Group, and Zanziper is the President. [Id.].

---

[6] The Certified Administrative Record is found in the record of this case at Docs 24, 25, and 26.

Beginning in February 2021, 84 of these companies, including the 48 Plaintiffs, applied for and received first-draw PPP loans, totaling almost $45 million. [A.R. at 670, 672-75, 708-09]. Between June and September 2022, all 84 companies applied for loan forgiveness. [See A.R. at 670]. SBA granted forgiveness of the first 36 loans but denied forgiveness of the 48 loans issued to the 48 Plaintiffs. [A.R. at 10-11, 670-71, 680-81]. The SBA's basis for denial was that the 84 companies owned by Hyman and Zanziper constituted a single corporate group, and therefore they exceeded the aggregate $20 million limit allowed under IFR No. 7. [A.R. at 10-11, 670-71, 680-81]. In its notice denying loan forgiveness, the SBA explained:

> After a review of the documentation provided, the SBA concludes that the Borrower business which is part of a corporate group has received more than $20,000,000 of First Draw PPP loans in the aggregate.
>
> Ownership by Naftali Zanziper and Simcha Hyman comprise of one single corporate group, Naftali Simcha et al, consisting of 343 entities, of which 84 entities received First Draw PPP loans totaling $44,983,180.44. The 84 entities meet SBA's alternative size standard and were eligible for PPP funding.
>
> However, of the 84 loans within the Naftali Simcha et al corporate group[,] 48 First Draw loans exceed the limitation of $20,000,000 in aggregate to a single corporate group and were disbursed after April 30, 2020. Therefore, the Borrowers of these 48 First Draw loans do not meet eligibility requirements for

> forgiveness of the Paycheck Protection Program Loan.

[A.R. at 10-11]. All 48 Plaintiffs appealed to SBA's Office of Hearings and Appeals ("OHA"), which consolidated 38 of the appeals in one proceeding and the remaining 10 in another. [A.R. at 23-24, 822-23]. The administrative law judges in both proceedings denied the Plaintiffs' appeals. [A.R. at 745-65, 1081-97]. This lawsuit followed.

## IV. DISCUSSION

The Plaintiffs argue that they are entitled to summary judgment in their favor because (1) IFR No. 7 is inconsistent with the CARES Act and therefore the SBA exceeded its statutory authority in enacting such rule; (2) the enactment of IFR No. 7 was arbitrary and capricious; (3) the SBA violated its rulemaking duties when it enacted IFR No. 7; and (4) the SBA's determination of the Plaintiffs' ineligibility for loan forgiveness was based on a legally and factually incorrect application of IFR No. 7. [Doc. 33]. The Defendants contend, on the other hand, that (1) IFR No. 7 is authorized under the CARES Act; (2) the enactment of IFR No. 7 was rationally related to the purposes of the CARES Act and the PPP; (3) the SBA did not violate APA rulemaking requirements; and (4) that the SBA properly applied IFR No. 7. [Doc. 35]. The Court addresses each of these arguments in turn.

13

## A. Statutory Authority for Enacting IFR No. 7

The Plaintiffs were denied forgiveness of their loans because they exceeded the $20 million loan cap set for corporate groups in IFR No. 7. The Plaintiffs contend that IFR No. 7 directly conflicts with the plain language of the CARES Act, which sets a loan cap of $10 million per borrower. As such, the Plaintiffs argue, the SBA acted exceeded its statutory authority in enacting this rule.

In making this argument, the Plaintiffs contend that the CARES Act provides that "*any* business concern . . . shall be eligible to receive a covered loan" and that "the only maximum borrowing limit Congress placed on loan amounts in the CARES Act was $10 million per eligible borrower." [Doc. 33 at 17]. The Plaintiffs argue that eligibility for loan forgiveness extends to all loans for which a borrower is eligible to receive under this program. Therefore, they contend that this statutory language means that *every* statutorily qualified business concern was eligible for forgiveness of a PPP loan of up to $10 million, regardless of whether such business fell within the parameters of IFR No. 7. Thus, they conclude that the statute provides no basis for the SBA to cap loan forgiveness at $20 million per corporate group.

Contrary to the Plaintiffs' argument, the plain terms of § 636(a)(36)(B) and (E) provide ample authority for SBA to adopt a regulation such as IFR

14

No. 7.  Section 636(a)(36)(B) provides that SBA "*may* guarantee [PPP] loans under the same terms [and] conditions" as other § 7(a) loans, "[e]xcept as otherwise provided" in the ensuing provisions of § 636(a)(36).  15 U.S.C. § 636(a)(36)(B) (emphasis added). The word "may" in a statute "clearly connotes discretion."  Biden v. Texas, 597 U.S. 785, 802 (2022) (citation and internal quotation marks omitted); see also Air Line Pilots Ass'n, Int'l v. U.S. Airways Grp., Inc., 609 F.3d 338, 342 (4th Cir. 2010) ("'[M]ay' typically indicates authorization without obligation" and "sometimes means 'won't.'") (citations and internal quotation marks omitted). Thus, the CARES Act grants the SBA discretion, but does not require it, to guarantee PPP loans meeting the Act's criteria.  See Gateway Radiology, 983 F.3d at 1257 ("[T]he permissive word 'may' vests the SBA with discretionary authority.").

Section § 636(a)(36)(E), in turn, provides that "the *maximum* [PPP] loan amount shall be *the lesser of*" a borrower's payroll-based amount or $10 million.  15 U.S.C. § 636(a)(36)(E) (emphasis added). Section 636(a)(36)(E) does not require that the PPP loan be *equal* to the borrower's payroll-based amount, or $10 million, whichever is less; rather, it sets the *maximum* amount that can be approved (and thus guaranteed) by the SBA.  Thus, § 636(a)(36)(E) does not entitle the loan applicant to receive the maximum award, or indeed any award at all.  See  85 Fed. Reg. at 26,325 n.1 (noting

that § 636(a)(36)(E) "specified a 'maximum'—but not a minimum—[PPP] loan amount").

When read together, these statutory provisions establish a ceiling on the size of the PPP loans that the SBA permitted. These sections do not require that the maximum amount be approved, or that *any* amount be approved at all. By its plain language, § 636(a)(36) confers on the SBA ample discretion to exercise its rulemaking authority under 15 U.S.C. § 9012 to set a lower aggregate ceiling for borrowers constituting a single corporate group. This conclusion makes sense given the fact that Congress only authorized a total amount for all such loans. If the aggregate of the eligible applications exceeded that total, then some applicants might get the maximum amount while others receive nothing at all.

Congress vested the SBA with authority to "take any and all actions [SBA] determines . . . are *necessary or desirable* in making . . . or otherwise dealing with" § 7(a) loans. 15 U.S.C. § 634(b)(7) (emphasis added). Such authority extends to loans made under the PPP. See Gateway Radiology, 983 F.3d at 1256 (noting that PPP is subject to SBA's existing authority because "the PPP was not created as a standalone program" but rather was incorporated into the existing § 7(a) program). By situating the PPP within § 7(a), Congress through the CARES Act clearly deferred to the SBA and

contemplated that the SBA would exercise substantial discretion, within the boundaries of the statute, in fashioning "necessary or desirable" rules for "making" or "otherwise dealing with" PPP loans from the limited amount of money authorized by Congress.

The SBA found it was necessary to adopt IFR No. 7 in order "[t]o preserve finite appropriations for PPP loans and [to] ensure broad access for eligible borrowers," "in light of the previous lapse of . . . appropriations and the high demand for PPP loans." 85 Fed. Reg. at 26,325 & n.1. Implementation of this Rule falls within the broad discretion that Congress conferred in §§ 636(a)(36)(B) and (E) and § 634(b)(7). The Plaintiffs' argument that the SBA acted inconsistently with the CARES Act in enacting IFR No. 7, therefore, is rejected.

## B.    Whether IFR No. 7 is Arbitrary and Capricious

"Unlike contrary-to-law analysis, arbitrary and capricious review is 'very deferential.' It is focused not on the substance of the regulation, but on 'the reasonableness of the agency's decisionmaking processes.'" <u>Vanda Pharms., Inc. v. Ctrs. for Medicare & Medicaid Servs.</u>, No. 23-1457, 2024 WL 1547092, at *10 (4th Cir. Apr. 10, 2024) (citations omitted), <u>cert. denied</u>, 2025 WL 76437 (Jan. 13, 2025).

"The arbitrary and capricious standard is not meant to reduce judicial review to a rubber-stamp of agency action.  While the standard of review is narrow, the court must nonetheless engage in a searching and careful inquiry of the record."  Ohio Valley Env't Coal. v. Aracoma Coal Co., 556 F.3d 177, 192 (4th Cir. 2009) (citations and internal quotation marks omitted).  The Court may find an agency action to be arbitrary and capricious where "the agency relied on factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Coleman v. Kendall, 74 F.4th 610, 619 (4th Cir. 2023) (citation omitted), cert. denied, 144 S. Ct. 818 (2024). The Court "must ensure that the agency has examined the relevant data and articulated a satisfactory explanation for its action."  Sierra Club v. W. Va. Dep't of Env't Prot., 64 F.4th 487, 501 (4th Cir. 2023) (citation and internal quotation marks omitted).

In enacting IFR No. 7, the SBA considered a number of relevant factors, including the legislative intent of the CARES Act and the PPP. Specifically, the SBA explained that its purpose was "[t]o preserve the limited resources available to the PPP program," noting "the previous lapse of PPP

appropriations and the high demand for PPP loans." 85 Fed. Reg. at 26,325. The agency also explained that the $20 million cap on loans would help make loans available to the highest number of borrowers. Id. As a result, IFR No. 7 made PPP loans more broadly available to smaller businesses that are without the financial resources available to businesses belonging to large corporate groups. The limitation on loans to businesses that belong to large corporate groups—in an effort to maximize the overall number of businesses that could receive loan assistance from the agency's finite resources—is a rational policy choice consistent with the goals of the PPP and the CARES Act in general. See Forest View Rehab. & Nursing Ctr., LLC v. U.S. Small Bus. Admin., No. 24 CV 1490, 2024 WL 5247837, at *10 (N.D. Ill. Dec. 30, 2024) (noting that SBA's "explanation is especially reasonable considering the high demand for loan dollars at the start of the COVID-19 pandemic.").

For the foregoing reasons, the Court finds that the SBA's decision to implement IFR No. 7 was not arbitrary or capricious.

## C. Whether SBA Violated Notice-and-Comment Requirements

The APA establishes the procedure that federal administrative agencies must use for rule making. 5 U.S.C. § 553. This procedure of "notice-and-comment rulemaking" requires the agency to issue a general notice of proposed rule, give opportunity for public comments, and then

19

consider and respond to significant comments received before promulgating the final rule.  Id.  In this case, however, Congress gave the SBA explicit statutory authority to bypass the usual notice-and-comment procedures when promulgating rules implementing the PPP.  Specifically, Congress directed that, "[n]ot later than 15 days after March 27, 2020, the Administrator shall issue regulations to carry out this title and the amendments made by this title without regard to the notice requirements under section 553(b) of Title 5."  15 U.S.C. § 9012.  The Plaintiffs argue that, because the IFR No. 7 was promulgated outside of this 15-day window, the rule needed to go through the typical rulemaking process, and therefore the rule was enacted unlawfully.

The Supreme Court has "expressed reluctance 'to conclude that every failure of an agency to observe a procedural requirement voids subsequent agency action, especially when important public rights are at stake.'" Barnhart v. Peabody Coal Co., 537 U.S. 149, 158 (2003) (quoting Brock v. Pierce County, 476 U.S. 253, 260 (1986)).  Accordingly, "if a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction."  United States v. James Daniel Good Real Prop., 510 U.S. 43, 63 (1993); see also Holland v. Pardee Coal Co., 269 F.3d 424, 431 (4th Cir.

2001) ("[S]tatutory provisions imposing a mandatory duty on an agency to act before a specific date are not generally construed to remove the agency's power to act after that date."). Here, § 9012 does not specify a consequence for noncompliance with the 15-day window. As such, the 15-day directive imposed by the statute should be read as an intent "to spur the [Administrator] to action, not to limit the scope of [her] authority." Barnhart, 537 U.S. at 158 (quoting Brock, 476 U.S. at 265). Accordingly, the Court concludes the SBA's failure to comply with that timeline does not invalidate its subsequent actions.[7]

For the foregoing reasons, the Court rejects the Plaintiffs' argument that the SBA violated its rulemaking duties in enacting IFR No. 7.

### D. Application of IFR No. 7 to Plaintiffs

The Plaintiffs also challenge as arbitrary and capricious the SBA's finding that the Plaintiffs are part of a "single corporate group" within the meaning of IFR No. 7.

As noted supra, IFR No. 7 provides, in relevant part:

---

[7] It is also noteworthy that the SBA did not promulgate any rules implementing the PPP until April 15, 2020, more than 15 days after March 27, 2020. See 85 Fed. Reg. 20811 (Apr. 15, 2020). Therefore, accepting the Plaintiffs' argument that the SBA lacked authority to enact rules without notice-and-comment procedures after the statutory deadline would mean that the SBA lacked authority for all of the rules related to the PPP, and that the Plaintiffs are challenging those rules as well. This is simply not logical, as the Plaintiffs do not contest the authority of the SBA to implement the PPP, and indeed, they themselves received loans under the program pursuant to agency rules.

> [B]usinesses that are **part of a single corporate group** shall in no event receive more than $20,000,000 of PPP loans in the aggregate. For purposes of this limit, **businesses are part of a single corporate group if they are majority owned, directly or indirectly, by a common parent**.

85 Fed. Reg. at 26325 (emphasis added). Thus, the $20 million limit set forth in IFR No. 7 is triggered if a company is part of a "single corporate group," meaning one that is "majority owned…by a common parent."

The Plaintiffs contend that they do not fall within the scope of IFR No. 7 for two reasons. First, the Plaintiffs argue that they do not share a "common parent" with each other or with any other entity that has received PPP loans. Second, the Plaintiffs argue that they are not "majority owned" by any one person or entity.

In arguing that they do not share a "common parent," the Plaintiffs primarily rely upon part of the Federal Acquisition Regulation ("FAR"), 48 C.F.R. §§ 4.900-4.904, which in pertinent part defines "common parent" as a "corporate entity that owns or controls an affiliated group of corporations." 48 C.F.R. § 4.901. This section, however, defines "common parent" solely for purposes of obtaining taxpayer-identification information from government contractors that may be used for debt collection and reporting to the IRS. The Plaintiffs contend that § 4.901 "applies to SBA government

contracts," citing <u>PDS Consultants, Inc. v. United States</u>, 907 F.3d 1345 (Fed. Cir. 2018). [Doc. 33: Pls.' Brief at 19]. <u>PDS Consultants</u>, however, in fact states that the FAR sets "policies and procedures for government acquisition of supplies and services," to which end it implements, *inter alia*, the small-business set-aside requirements of the Small Business Act. 907 F.3d at 1349, 1351. The present case does not concern SBA contracts to acquire supplies and services from small businesses, but rather SBA-guaranteed loans to small businesses. FAR § 4.901 does not apply to the interpretation of "common parent" within IFR No. 7.

There is substantial evidence in the record before the Court to support the SBA's conclusion that the Plaintiffs are all majority-owned by a "common parent" entity, namely, the partnership-in-fact between Simcha Hyman and Naftali Zanziper. The evidence in the administrative record reflects that Hyman and Zanziper intended to associate with one another as co-owners of a conglomerate of more than 340 LLCs, all subject to their joint control (as exercised through oversight by the Portopiccolo Group), with the two of them sharing the companies' profits (and responsibility for their losses). The record therefore contains more than sufficient evidence from which the SBA reasonably could conclude (i) that a de facto Hyman-Zanziper partnership

existed, and (ii) that this partnership is the "common parent" of each of the Plaintiffs.

The Plaintiffs argue that the Hyman-Zanziper partnership is not their common parent, because as a matter of form they are owned by Hyman and Zanziper as *individuals*, with neither individual holding a majority share in each entity. This argument, however, ignores the plain text of IFR No. 7, which provides that borrowers are part of the same corporate group if they are owned "*directly or indirectly*, by a common parent." 85 Fed. Reg. at 26,325 (emphasis added). Further, it is well recognized that the members of a partnership may form separate business entities (such as corporations or LLCs) as means to carry out the partnership's objectives, while still remaining partners as between themselves. Thus, even though Hyman and Zanziper have structured their joint enterprise so that in form each constituent LLC, viewed in isolation, is directly owned by the two of them individually, their *de facto* partnership is in substance the indirect owner of all 84 LLCs that sought PPP loans, including the Plaintiffs.

In sum, substantial evidence supports the conclusion that the Plaintiffs are owned directly or indirectly by a common parent entity within the meaning of IFR No. 7. Therefore, the Plaintiffs have failed to carry their burden of

showing that the SBA acted arbitrarily or capriciously when it found that the Plaintiffs were part of the same corporate group.

## V. CONCLUSION

In conclusion, the Court concludes that the SBA enacted IFR No. 7 within its statutory authority and in compliance with administrative rulemaking procedures. Therefore, the Hyman-Zanziper LLCs were only entitled to forgiveness of their PPP loans in the aggregate of $20 million. After having forgiven that amount the SBA denied further forgiveness, and thus properly denied loan forgiveness to the 48 LLCs before this Court. Accordingly, the Court grants the Defendants' Motion for Summary Judgment, denies the Plaintiffs' Motion for Summary Judgment, and will enter Judgment in favor of the Defendants.

## ORDER

**IT IS THEREFORE ORDERED** that the Defendants' Motion for Summary Judgment [Doc. 34] is **GRANTED**, and the Plaintiffs' Motion for Summary Judgment [Doc. 32] is **DENIED.** The Plaintiffs' claims against the Defendants are hereby **DISMISSED WITH PREJUDICE.**

The Clerk of Court is respectfully directed to enter a judgment consistent with this Memorandum of Decision and Order contemporaneously herewith.

**IT IS SO ORDERED.**

Signed: April 8, 2025

Martin Reidinger
Chief United States District Judge